# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| J. MARIE RITCHIE | ) | |
| | ) | |
| Plaintiff, | ) | No. 14 C 499 |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| CAROLYN COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On March 25, 2011, Plaintiff Marie Ritchie filed an application for supplemental security income, alleging disability beginning December 30, 2007. The claim was denied initially on June 10, 2011, and upon reconsideration on July 27, 2011. Thereafter, Ritchie filed a written request for hearing on August 9, 2011. The hearing was held before an Administrative Law Judge ("ALJ") on August 16, 2012. Ritchie was represented by counsel at the hearing, at which only Ritchie and a vocational expert testified.[1] On August 31, 2012, the ALJ issued a written decision denying Ritchie's application. Ritchie appealed that decision to the Appeals Council of the Social Security Administration, which denied Ritchie's request for review. Acting pro se, Ritchie then filed this action seeking judicial review. The Court

---

[1] The ALJ's written decision states that an impartial medical expert also testified at the hearing, but the hearing transcript shows otherwise.

appointed Ritchie an attorney, who filed an amended complaint, followed by a motion for summary judgment asking the Court to reverse the ALJ's decision. The Commissioner of Social Security ("Commissioner") filed a cross-motion for summary judgment asking the Court to affirm. For the reasons that follow, Ritchie's motion is granted, the Commissioner's motion is denied, and the case is remanded for further proceedings.

## STANDARD OF REVIEW

Judicial review of a final decision of the Social Security Administration is generally deferential. The Social Security Act requires the court to sustain the ALJ's findings if they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court should review the entire administrative record, but must "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the [ALJ]." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). "However, this does not mean that [the court] will simply rubber-stamp the [ALJ's] decision without a critical review of the evidence." *Id.* A decision may be reversed if the ALJ's findings "are not supported by substantial evidence or if the ALJ applied an erroneous legal standard." *Id.* In addition, the court will reverse if the ALJ does not "explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 351 (7th Cir. 2005). "Although a written evaluation of each piece of

evidence or testimony is not required, neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *see Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence."). Additionally, the ALJ "has a duty to fully develop the record before drawing any conclusions," *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007), and deference in review is lessened when the ALJ has made errors of fact or logic, *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). In oft-quoted words, the Seventh Circuit has said that the ALJ "'must build an accurate and logical bridge from the evidence to his conclusion.'" *Clifford*, 227 F.3d at 872 (quoting *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014)). When the ALJ has satisfied these requirements, the responsibility for deciding whether the claimant is disabled falls on the Social Security Administration, and, if conflicting evidence would allow reasonable minds to differ as to whether a claimant is disabled, the ALJ's decision must be affirmed. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990) (internal quotation marks and citation omitted).

## BACKGROUND

### A.    RITCHIE'S CONDITIONS

Ritchie was born in 1958. Her work history over the past 15 years includes selling health insurance from 1994 through 1995, and selling real estate from 2002 until 2007. AR 186.[2] Ritchie obtained her real estate license in 2002 and initially

---

[2] Citations to "AR" are to the Administrative Record, R. 23-1.

started out working for an agency. AR 42, 43. In 2005, she opened her own real estate business. AR 43. In November 2007, Ritchie was admitted to Jackson Park Hospital following an incident in which she passed out at her home. AR 268. Hospital records indicate that she had pneumonia. In addition, she was diagnosed with malignant hypertension, syncope (fainting), and anemia. *Id.* She was referred to a cardiologist, who diagnosed her with cardiomyopathy[3] and hypertensive heart disease.[4] AR 322. Ritchie testified that her job as a realtor required her to be on her feet about six or seven hours in a day, that she did not work a normal eight-hour day, and that she was "[o]n call 24/7." AR 63-64. She also testified that she was required to lift and carry yard signs that weighed an average of 30 pounds and to dig the holes for the signage. AR 64. Ritchie stopped working at the end of 2007 because of her illness. The symptoms she was experiencing that made her stop work included "headaches, chest pains, nosebleeds, nausea, frequent urination, occasional constipation, fatigue, and dizziness. AR 48. She testified that "[i]t was like my heart would race and you could almost see the [ ] chest pain." AR 48.

At the hearing before the ALJ, Ritchie was asked about her then-current level of functioning. She testified that she gets up at 5:30 a.m. every morning. *Id.*

[3] Cardiomyopathy is a condition where the heart muscle is abnormal making it harder for the heart to pump and deliver blood to the rest of the body *See* http://www.mayoclinic.org/diseases-conditions/cardiomyopathy/basics/definition/con-20026819 (last visited December 14, 2016).

[4] Hypertensive heart disease refers generally to heart conditions caused by high blood pressure, and can include a number of different heart disorders such as heart failure, thickening of the heart muscle, coronary artery disease, and other conditions. *See* http://www.healthline.com/health/hypertensive-heart-disease (last visited December 14, 2016).

AR 52. She spends more than half her day sleeping because she experiences chest pains, dizziness, and nausea. AR 56. Her dizziness is once or twice a day typically occurring "early mornings or midday." AR 50-51. The dizziness is over in a matter of seconds, and, when it happens, she has to sit down. *Id.* In addition, she experiences fatigue, which comes and goes throughout the day "without rhyme or reason" and causes her to sleep intermittently. AR 50, 64. She also has headaches, which tend to occur "two or three days out of the week." AR 49-50. She deals with the headaches by sleeping. The only household chores Ritchie is able to do is wash dishes. AR 55. She cooks a light lunch and dinner, and drives locally every three days or so to the grocery store. AR 53, 55. The only exercise in which she engages is walking outside for about ten minutes (four to six blocks) every other day. AR 55. She does not have any hobbies and does not spend time visiting with friends. AR 57. When she is awake at home she spends her time either talking to her mother by phone or reading the Bible. AR 56. She goes to bed around 9:00 or 9:30 every night. AR 52. She sleeps well at night except for having to get up to urinate two to three times a night. *Id.*

Ritchie estimated that she spends a total of two hours on her feet standing or walking, AR 57-58, and five to six hours sitting upright, AR 58. She spends at least six or more hours of each day sleeping. AR 56. She estimated that she could sit for thirty or forty minutes straight before having to make a change because of leg cramps, and that she could stand for thirty minutes at a time and walk for about ten minutes. AR 60-61. She can only climb about three or four stairs because she

gets tired and her heart starts beating faster and racing. AR. 65. She also testified that she suffers from poor vision, needs glasses but lost them so is not able to see very well, and has had trouble with cloudy peripheral vision even when she had her glasses. AR 65-66. Ritchie reports that she takes Enalapril for her heart, Hydrochlorothiazide as a diuretic, iron pills for her anemia, and Nifedipine to slow her heartbeat and keep the blood from flowing backwards. She stated that she suffers from "nausea," "headaches," and "fatigue" as side effects of her medications. AR 59. Following her 2007 hospitalization, Ritchie began receiving monthly care for check-ups and medication refills at Jackson Park Clinic. Her current treating physician is Dr. Farkash, but prior to August 3, 2012, she was treated by Dr. Ali. AR 61.

### B.   THE ALJ'S DECISION

A person is disabled under the Social Security Act if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "To determine disability, the ALJ makes a five-step inquiry: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commission considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in

the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citing 20 C.F.R. § 404.1520). "'An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled.' The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford,* 227 F.3d at 868 (quoting *Zalewski v. Heckler*, 760 F. 2d 160, 162 n.2 (7th Cir. 1985)).

The ALJ found that Ritchie had not engaged in substantial gainful activity since March 25, 2011, the application date (Step 1); that the medical evidence showed Ritchie had severe impairments (*see* 20 C.F.R. § 404.1520(c)) consisting of valvular heart disease with regurgitation,[5] hypertension, and anemia (Step 2); and, that none of Ritchie's impairments were of the type that the Social Security Administration considers conclusively disabling (Step 3). Neither party disputes these findings. Instead, the area of dispute involves the ALJ's Step 4 and Step 5 determinations of whether Ritchie can perform her past relevant work as a real estate agent, and, if not, whether she is capable of performing any other work in the national economy.

---

[5] Ritchie reported to the consultative physician that she has been told she suffers from congenital mitral valve regurgitation. AR 238. "Mitral regurgitation is leakage of blood backward through the mitral valve each time the left ventricle contracts. A leaking mitral valve allows blood to flow in two directions during the contraction. Some blood flows from the ventricle through the aortic valve—as it should—and some blood flows back into the atrium." http://www.heart.org/HEARTORG/ Conditions/More/HeartValveProblemsandDisease/Problem-Mitral-Valve-Regurgita tion_UCM_450612_Article.jsp# (last visited December 14, 2016).

Before turning to Step 4, the ALJ was required to make a determination of Ritchie's residual functional capacity ("RFC"). *See* 20 C.F.R. § 416.920(e). A claimant's RFC "is the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). The ALJ found that Ritchie had the ability to occasionally lift and carry 20 pounds, frequently lift and carry ten pounds, stand or walk six of eight hours with customary breaks, and sit six of eight hours with customary breaks. AR 25. This finding put Ritchie's RFC in the light work category.[6] Due to Ritchie's history of dizziness and her 2007 episode of syncope (fainting), the ALJ also imposed the additional limitation that she avoid concentrated exposure to hazards such as unprotected heights, hazardous moving machinery, and open and unprotected conditions. AR 25.

After determining Ritchie's RFC, the ALJ turned to the Step 4 question of whether Ritchie has past relevant work. The ALJ found that Ritchie had past relevant work in 2007 as a real estate broker, and, based on the testimony of the vocational expert, that Ritchie's description of her prior job would result in that work falling in the "medium" category.[7] AR 30. The ALJ also found based on the testimony of the vocational expert that the job of real estate broker as it is typically

---

[6] *See* 20 C.F.R. § 416.967(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.").

[7] *See* 20 C.F.R. § 416.967(c) ("Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.").

performed falls within the category of light work. *Id.* The ALJ then compared Ritchie's RFC "with the physical and mental demands of" work as a real estate agent, and concluded that Ritchie was able to perform the work of real estate agent "as [it] generally [is] performed." *Id.*; *see also* AR 68 (vocational expert testimony). In the alternative, the ALJ concluded that even if Ritchie was not capable of performing past relevant work as a real estate agent, other jobs existed in the national economy that she was able to perform given her vocational profile and RFC for light work. The ALJ determined that Ritchie could make a successful adjustment to some of the jobs in this category (such as cashier II, mail clerk, and hand packager), taking into consideration Ritchie's vocational profile, her RFC of light work, and the additional limitations the ALJ had imposed regarding hazards such as unprotected heights, moving machinery, and open and unprotected conditions. AR 31; *see also* AR 68 (vocational expert testimony). Accordingly, the ALJ concluded that Ritchie could perform either her past relevant work as a real estate broker or one of several other jobs available in the national economy, and that she therefore was not disabled. *Id.*

## DISCUSSION

### A.    TREATING PHYSICIAN OPINION

Ritchie's primary argument for reversal of the ALJ's decision is that the ALJ improperly discounted the opinion of her treating physician, Dr. Ali. The Court's review of this issue is governed by well established legal principles.

### 1. THE ALJ'S DECISION NOT TO ACCORD DR. ALI'S OPINION "CONTROLLING WEIGHT"

"Under a rule adopted by the Commissioner of Social Security, in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003) (citing 20 CFR §§ 404.1527(d)(2), 416.927(d)(2)). The rule is that "[g]enerally," the Social Security Administration will "give more weight to opinions from [the claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). If the ALJ finds "that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [he] will give it controlling weight." *Id.*; *accord Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). "An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); *see Humphries v. Colvin*, 2015 WL 9268211, at *4-6 (N.D. Ill. Dec. 21, 2015).

Dr. Ali treated Ritchie from sometime in 2009 until August 3, 2012. AR 61. On October 18, 2011, Dr. Ali completed a form questionnaire titled "Medical Assessment of Condition And Ability To Do Work Related Activities." Dr. Ali answered "yes" to the question whether Ritchie could be expected to have "good days" and "bad days," and "yes" to the question whether during "bad days" Ritchie would have difficulty in sustained performance of even ordinary activity of daily living and household chores. AR 263. Dr. Ali answered "10 pounds" for the amount of weight Ritchie could be expected to lift occasionally and "5 pounds" for the amount of weight she could be expected to lift frequently. AR 264. She answered "5 to 6 out of an 8-hour workday" for the number of hours Ritchie could be expected to sit on a "good day" and only "2" for a "bad day." AR 263. She answered "3" for the number of hours uninterrupted that Ritchie could sit on a good day and 1½ hours for a bad day. *Id.* These numbers are lower than the ALJ's RFA "light work" determination. If accepted, they likely would have placed Ritchie in the sedentary work category,[8] which probably would have resulted in a finding of disability.[9] But

---

[8] *See* 20 C.F.R. § 416.967(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.").

[9] The ALJ asked the vocational expert whether there would be work for a person with Ritchie's vocational profile who could only sit for less than three hours straight and a total of six hours per day, could lift only six to ten pounds occasionally, and five or less pounds frequently, and would need to lie down intermittently in a work day for up to two hours. The vocational expert answered that he could not identify any work in the national economy for such a person. AR 69.

the ALJ "reject[ed]" Dr. Ali's opinion, stating that it was entitled to "little weight." AR 29.

The first reason the ALJ gave for rejecting Dr. Ali's opinion is that Dr. Ali "fails to give a reason for limiting [Ritchie] to only 10 pounds occasionally and 5 pounds frequently." *Id.* It is true that Dr. Ali's responses in the questionnaire do not contain any explanatory analysis. But even the ALJ recognized that "the basis stated for the limitations is the valvular heart regurgitation, hypertension and dizziness." *Id.* "Although by itself a check-box form might be weak evidence, the form takes on greater significance when it is supported by medical records." *Larson v. Astrue,* 615 F.3d 744, 751 (7th Cir. 2010); *see also Roth v. Colvin*, 2016 WL 890750, at *8 (N.D. Ill. Mar. 9, 2016) (rejecting ALJ's finding fault with treating physician for not providing a narrative commentary on form where form "did not provide space for such narrative" and where claimant's medical records supported treating physician's assessment).

The ALJ should have explained why Ritchie's medical records did not support Dr. Ali's weight lifting limitation. *See Clifford,* 227 F.3d at 872 ("the ALJ does not explain why the objective medical evidence does not support Clifford's complaints of disabling pain"). The ALJ cannot dispute that Ritchie's medical conditions have the potential to justify the restrictions noted by Dr. Ali in his opinion, because those conditions meet the criteria of a "severe impairment" under Step 2. Moreover, the limitations noted by Dr. Ali appear to be consistent with what could be expected for

someone with Ritchie's medical conditions.[10] Without a discussion of why Dr. Ali's form responses were not supported by Ritchie's medical records, it appears that the ALJ's decision was based simply on his own conclusion that Ritchie's medical conditions were not sufficiently severe to warrant the restrictions noted by Dr. Ali. As the Seventh Circuit "has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).

"[T]o the extent a treating physician's opinion is consistent with the relevant treatment notes and the claimant's testimony, it should form the basis for the ALJ's determination." *Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013) (citation omitted). The ALJ did not find any inconsistencies between Dr. Ali's weight lifting limitation and Ritchie's medical records,[11] and instead merely criticized Dr. Ali for failing to connect the dots. While the Court does not disagree with the ALJ that additional information or analysis connecting Ritchie's conditions/symptoms with

---

[10] Common symptoms of congenital mitral valve regurgitation may include breathlessness with exertion or even at rest, swelling of the legs, ankles and feet, bloating of the abdomen due to fluid buildup, cough while lying down, fatigue, irregular heartbeats that feel rapid, pounding or fluttering, chest pain, dizziness, lightheadedness, and fainting. *See* http://www.mayoclinic.org/diseasesconditions/ cardiomyopathy/basics/symptom s/con-20026819. A common symptom of anemia is feeling tired and weak. *See* http://www.mayoclinic.org/diseases-conditions/ anemia/home/ovc-20183131 (last visited December 14, 2016).

[11] The ALJ discussed Ritchie's medical records in a different part of his written decision, observing that those records "show only very routine and conservative treatment," that "her hypertension is controlled, and that she does not have complaints." AR 27. These facts, however, are not inconsistent with Dr. Ali's stated weight lifting limitation. Moreover, the Seventh Circuit has "frequently warned against . . . [an ALJ] focus[ing] solely on the reports of stability and ignor[ing] the many complaints of persisting symptoms." *Roth*, 2016 WL 890750, at *9.

the limitations stated in Dr. Ali's opinion would have been helpful, that observation alone does not justify rejecting Dr. Ali's opinion. Instead, the absence of a better explanation warranted a further investigation into the basis for Dr. Ali's opinions. *See, e.g., Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (noting that the treating physician's opinion was not inconsistent with the claimant's record of past treatment" and that, "if the ALJ's real concern was the lack of backup support for [the] opinion," then the ALJ had "a duty to solicit additional information to flesh [it] out")) (citing 20 C.F.R. § 404.1527(c)(3), S.S.R. 96–2p at 4, and *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996) ("If the ALJ thought he needed to know the basis of [medical] opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them.")); *see also Smith v. Apfel,* 231 F.3d 433, 437 (7th Cir. 2000) ("Although a claimant has the burden to prove disability, the ALJ has a duty to develop a full and fair record. Failure to fulfill this obligation is 'good cause' to remand for gathering of additional evidence.") (citation omitted); *Humphries*, 2015 WL 9268211, at *6 ("[i]f the ALJ has any questions about whether to give controlling weight to Dr. Ahmad's opinion, he is encouraged to re-contact him"). The ALJ did not undertake any further investigation, and erred in rejecting Dr. Ali's opinion without doing so.

The ALJ also rejected Dr. Ali's opinion (1) for indicating the need to lie down intermittently during the day without also indicating the total time required, and (2) for indicating that Ritchie could sit for five to six hours on a good day and only

one to three hours on a bad day without defining what is meant by "good day" and "bad day." Neither criticism is justified. The Seventh Circuit has noted that the need to lie down during the day by itself (regardless of total time) would likely prevent a person from maintaining full-time employment. *See Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016) ("Stark's need for frequent breaks is *not* consistent with light work activity") (emphasis in original) (citing *Roddy*, 705 F.3d at 639 ("inability to get through the day without lying down every hour does not indicate ability to work even sedentary job"); *see also Humphries*, 2015 WL 9268211, at *6 (the "modern workplace" would not accommodate a plaintiff who "reported that she has to rest for 10 to 15 minutes after walking a block and rests and naps after her volunteer work 'due to weakness and fatigue'"). And the terms "good day" and "bad day" do not need defining; they obviously mean days in which Ritchie is feeling well and days in which she is not feeling well. The fact in itself that Ritchie might experience good days and bad days would make maintaining full-time work difficult. *See Allensworth v. Colvin*, 814 F.3d 831, 833 (7th Cir. 2016) ("gainful employment . . . normally requires an ability to work a 40-hour week without missing work more than twice a month"). The Seventh Circuit understands and has provided instruction on this:

> A person who has a chronic disease . . . and is under continuous treatment for it with heavy drugs, *is likely to have better days and worse days*; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job.

*Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) (emphasis added) (internal citations omitted); *see also Vacco v. Colvin*, 2016 WL 738455, at *7 (N.D. Ill. Feb. 25, 2016) ("the Commissioner [has] issued guidance for evaluating fibromyalgia claims that admonishes adjudicators to be aware of the fluctuating nature of symptoms, *which will produce good and bad days . . .*") (emphasis added) (citing Social Security Ruling (SSR) 10 12–2p)).

The ALJ's final criticism of Dr. Ali's opinion was that it appeared to reflect Ritchie's self-reports concerning her condition more than Dr. Ali's medical conclusions. This criticism could have a bit more merit, although it is difficult to tell on the current record. "[I]f the treating physician's opinion is . . . based solely on the patient's subjective complaints, the ALJ may discount it." *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *see also Reyes v. Colvin*, 2015 WL 6164953, at *12 (N.D. Ill. Oct. 20, 2015) ("the ALJ was free to question the credibility of Plaintiff's subjective statements and, relying upon his adverse credibility determination . . . discount Dr. Aloman's opinion to the extent it relied on those subjective complaints"). It is true that Dr. Ali's report indicates in several places that her answers were "per patient." The problem, however, is that the ALJ's blanket rejection of the entire report on this basis seems inconsistent with the fact that Dr. Ali specifically identified certain questions for which her answer was based on the patient's report,[12] as well as certain questions she could not answer at all (and

_____

[12] For instance, in response to the question asking how many pounds Ritchie could carry, Dr. Ali wrote "6" ("for 2 to 3 feet occasionally" and "for 5 feet frequently," which is confusing because she correlates a longer distance with greater abilities),

therefore left blank) because of lack of knowledge.[13] In addition, as noted by the Seventh Circuit, the cases in which the court has upheld an ALJ's decision to discount a medical opinion on the basis that it relies on subjective complaints of the claimant involve situations where the claimant's complaints "could not be explained by the objective medical evidence." *Aurand v. Colvin*, 654 Fed. App'x 831, 837 (7th Cir. 2016) (unpublished) (citing *Bates*, 736 F.3d at 1100, and *Dixon*, 270 F.3d at 1178). That is not the case here, as Ritchie has certain medical conditions that do appear to explain the symptoms she reports.

The Seventh Circuit recently cautioned with respect to patient complaints of chronic pain that "physical pain often cannot be explained through diagnostics," and that it thus was "illogical to dismiss the professional opinion of an examining [physician] simply because that opinion draws from the claimant's reported symptoms." *Aurand,* 654 Fed. App'x at 837. Ritchie's complaints of chronic fatigue would fall in the same category. "Almost all diagnoses require some consideration of the patient's subjective reports, and certainly [the claimant's] reports had to be factored into the calculus that yielded the doctor's opinion." *McClinton v. Astrue*, 2012 WL 401030, at *11 (N.D. Ill. Feb. 6, 2012). To discount Dr. Ali's findings on

---

and next to that answer Dr. Ali also wrote "per patient." But in response to the question asking how many pounds Ritchie could lift (as opposed to carry), Dr. Ali wrote "10 occasionally" and "5 frequently," without indicating "per patient" next to her response. AR 264.

[13] Inexplicably, the ALJ used Dr. Ali's honesty regarding her lack of knowledge (*i.e.*, as to how many hours Ritchie could stand and/or walk) as a reason to discount Dr. Ali's response to questions she did answer. Logically, Dr. Ali's full disclosure regarding her lack of knowledge concerning that one question would weigh in favor of the credibility of the responses she gave to other questions on the form.

this basis, the ALJ should have pointed to evidence in the record that would "suggest that Dr. [Ali] disbelieved [Ritchie's] descriptions of her symptoms, or that Dr. [Ali] relied more heavily on [Ritchie's] descriptions than . . . [her] own clinical observations." *Guerin v. Colvin*, 2015 WL 5950612, at *8 (N.D. Ill. Oct. 13, 2015); *see also Davis v. Astrue*, 2012 WL 983696, at *19 (N.D. Ill. March 21, 2012) ("The ALJ fails to point to anything that suggests that the weight [Plaintiff's treating psychiatrist] accorded Plaintiff's reports was out of the ordinary or unnecessary, much less questionable or unreliable."). The ALJ failed to explain his reasons for concluding that Dr. Ali's entire opinion reflects an uncritical and unexamined acceptance of Ritchie's self-reporting, as opposed to Dr. Ali's medical opinion based on objective medical evidence in combination with Ritchie's reports of symptoms.[14] Thus, the ALJ failed to "build an accurate and logical bridge from the evidence to his conclusion." *Beardsley*, 758 F.3d at 834.

## 2. THE ALJ'S DECISION TO ACCORD DR. ALI'S OPINION "LITTLE WEIGHT"

Even if the ALJ had articulated good reasons for not giving Dr. Ali's opinion controlling weight, the ALJ still failed to articulate a sound basis for according that

---

[14] In her brief, the Commissioner points to the "additional comments" section at the end of Dr. Ali's questionnaire, where Dr. Ali wrote: "patient not worked for 9 years, no objective measure available, answers as per patient ability at home." AR 165. It is not clear what Dr. Ali meant by this comment, which does not specifically say that her answers were based solely on the patient's self-reporting. In addition, the ALJ did not cite to this comment, and therefore the Court has no way of knowing whether he relied on it in reaching the conclusion that Dr. Ali's opinion was overly influenced by patient self-reporting. To the extent that Dr. Ali's "additional comment" needed clarification or raised questions about the basis for Dr. Ali's opinion, the ALJ should have sought clarification either directly from Dr. Ali or through questioning of Ritchie at the hearing.

opinion only "little weight." *See* 20 C.F.R. § 404.1527(a)(2) ("When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion."). "The analysis is a 'two-step process' in which the ALJ first determines whether the opinion deserves controlling weight, and next evaluates the opinion" to determine what weight to assign it. *Schickel v. Colvin*, 2015 WL 8481964, at *11 (N.D. Ill. Dec. 10, 2015) (quoting *Duran v. Colvin*, 2015 WL 4640877, at *8 (N.D. Ill. Aug. 4, 2015)). In determining what weight to assign the opinion of a treating physician not accorded controlling weight by the ALJ, the regulations direct the ALJ "to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). In assigning Dr. Ali's opinion "little weight," the ALJ said nothing regarding this inquiry.

"There is some disagreement within the Seventh Circuit as to whether or not an ALJ's failure to explicitly discuss all the factors in a decision requires remand on its own." *Jones v. Colvin*, 2015 WL 6407533, at *11 (N.D. Ill. Oct. 22, 2015) (citing cases); *see also Duran*, 2015 WL 4640877, at *8 (criticizing the ALJ for "not apply[ing] the clear two-step process," and, instead, conflating it "into a single, amalgamated discussion without so much as applying the regulations," and noting that "[t]he constant failure [of ALJs] to simply apply the two-step process in a clear

19

manner has resulted in two distinct—and difficult to reconcile—lines of cases in the Seventh Circuit, . . . [o]ne . . . forgiving of the ALJ's procedural snafu, [and] [t]he other . . . much more restrictive") (citations omitted). Regardless of which view the Court were to adopt, however, the ALJ's decision would be insufficient because he failed to even articulate his decision in a manner that shows he considered, without explicitly discussing, any of the required factors. *See Schreiber v. Colvin*, 519 Fed. App'x 951, 959 (7th Cir. 2013) (unpublished); *McCullough v. Apfel*, 2000 WL 1657966, *4 (7th Cir. 2000) (unpublished).

### 3. THE ALJ'S DECISION TO ACCORD DR. CARLTON'S OPINION "SIGNIFICANT WEIGHT"

The record contains a report of a consultative examiner, Dr. Carlton, who spent approximately thirty minutes obtaining Ritchie's medical history and performing the consultative examination. AR 238. The ALJ characterized Dr. Carlton's report as being "better articulated" than Dr. Ali's opinion, and accorded it "significant weight." AR 29. In fact, however, the consultative report is no less short on analysis than Dr. Ali's opinion. In particular, Dr. Carlton stated in his report that he believed Ritchie could perform tasks that involve lifting up to 20 pounds, but he does not provide any analysis or basis for that opinion. According to the ALJ, Dr. Carlton's physical examination of Ritchie "noted no abnormal heart sounds and physical examination findings were all within normal limits." AR 29. But Dr. Carlton's physical examination consisted of testing and finding no deficiencies in Ritchie's abilities to (1) walk on her toes, (2) walk on heels, (3) squat and arise, (4) tandem walking, and (5) getting on and off the exam table. AR 241.

Similarly, Dr. Carlton tested and found no deficiencies in Ritchie's abilities to: (1) open a door using a knob, (2) squeeze BP cuff bulb, (3) pick up a coin, (4) pick up and holding a cup, (5) pick up a pen, (6) button and unbutton, (7) zip and unzip, and (8) tie shoe laces. AR 243. None of these findings regarding Ritchie's "normal" physical functioning demonstrate that Ritchie is capable of performing tasks that require lifting of 20 pounds given her complaints of fatigue, dizziness, headaches, and nausea. It would seem that a conclusion that Ritchie could perform tasks that involve lifting 20 pounds would be supported by a test where Ritchie actually lifted 20 pounds. There is no indication such a test was given.

Nor does Dr. Carlton's testing support the ALJ's conclusions on Steps 4 and 5 that Ritchie could  perform work as a realtor, which would require, according to the light weight classification, lifting of up to 20 pounds occasionally and 10 pounds frequently *as well as* "a good deal of walking or standing." 20 C.F.R. § 416.967(b); *see also Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995) ("[a] job in [the light work] category requires much walking or standing (off and on, for a total of approximately six hours of an eight-hour workday"). In addition, it is common knowledge that a job as a realtor involves frequent getting in and out of cars and repeated climbing of stairs, all activities which, if Ritchie's testimony is believed, would be difficult for her. There were no tests (or at least evidence of them) measuring her ability to climb stairs, such as actually demonstrating that she could do so. Although the ALJ also cites to Dr. Carlton's other findings beyond the 20-pound lifting capacity, those findings are equally unenlightening on whether Ritchie could perform light work

such as a realtor performs. Dr. Carlton states only that he "believe[s] the claimant [1] can sit and stand[,] . . . [2] can walk greater than 50 ft. without an assistive device[,] . . . [3] can handle objects using both hands[,] [and] [4] can hear and speak," and that [t]his is a conservative estimate of this claimant's functional ability based on a time limited history, physical examination and review of medical records available at the time of this consultative evaluation." AR 241. In other words, Dr. Carlton found no more than that Ritchie is alive and functions at a basic human level.[15]

"[I]f the treating physician's opinion is inconsistent with the consulting physician's opinion, . . . the ALJ may discount it." *Ketelboeter*, 550 F.3d at 625. Other than Dr. Carlton's conclusion that Ritchie could lift up to 20 pounds (which, as discussed, is not supported by any tests or other evidence reported in his opinion), Dr. Carlton's report is not in conflict with Dr. Ali's report. And lifting ability is not the only (or necessarily even the most important) issue relevant to whether Ritchie has the RFC for either her past job as a realtor or another job as stated by the ALJ. Ritchie testified that she is disabled because of her fatigue,

---

[15] It is interesting that Dr. Carlton qualifies his estimates regarding Ritchie's abilities based on the limited nature of his examination and review, but then uses the word "conservative" as suggestive that Ritchie's abilities could be greater than his findings. Logically, the admittedly limited nature of his examination just as likely could mean that Ritchie's capabilities could be more limited, not greater, than what he found. But the ALJ cited to Dr. Carlton's "conservative estimate" statement to buttress the ALJ's conclusion that Dr. Carlton's findings supported a "light work" classification of functioning ability. AR 29. In fact, by referring to his estimates as "conservative," Dr. Carlton appears to recognize that they establish only a minimal level of functional capacity. The ALJ erred in finding that the consultative report speaks to anything beyond that minimal functioning level.

dizziness, headaches, and nausea, and her need to sleep intermittently throughout day. Nothing in Dr. Carlton's medical examination or opinion based on that exam speaks to those issues. Nor do any of Dr. Carlton's findings address whether Ritchie's symptoms would prevent her from standing or walking for a total of six hours of an eight hour workday or prevent her from performing her past job as a realtor or any jobs in the light work category.[16] Indeed, the ALJ's reasons for according Dr. Carlton's opinion "significant weight" are almost identical to those that were rejected in *Beardsley*, 758 F.3d at 839:

> The ALJ considered Dr. Brill's opinion more persuasive because it was "consistent with the record as a whole." But as explained above, Ms. Beardsley's daily activities and reported capabilities were inconsistent with Dr. Brill's recommendations. Beyond noting that Ms. Beardsley exhibited normal range of motion in her joints, Dr. Brill provided no explanation for thinking that she was able to spend so much time on her feet (let alone climbing, operating foot controls, or crouching down). The ALJ's conclusory statement that these findings were consistent with the record when in fact they are contradicted by it was not enough to justify elevating Dr Brill's opinion over all others.

The ALJ's conclusions regarding Dr. Carlton's opinion are not supported by substantial evidence. Accordingly, neither his decision to discount Dr. Ali's opinion nor his RFC "light work" findings is saved by his reliance on the consultative exam.

---

[16] The ALJ stated that he accorded the opinions of two non-examining consultants "slight weight," yet, at the same time, he used those opinions to "corroborate" Dr. Carlton's findings. *Id.* at 33 (AR 29-30). The non-examining consultants made similar findings as Dr. Carlton, so the ALJ's attempt to both substantially reject their opinions and at the same time rely on them to buttress Dr. Carlton is somewhat perplexing.

### 4. CONCLUDING OBSERVATIONS REGARDING DR. ALI'S OPINION

All the above is not to say that the ALJ should have accorded Dr. Ali's opinion controlling weight or even some weight. In the first place, Dr. Ali's opinion, in the absence of further explanation, appears to suffer from some internal inconsistencies.[17] While "internal inconsistencies may provide good cause to deny controlling weight to a treating physician's opinion," *Lehouillier v. Colvin*, 633 Fed. App'x 328, 334 (7th Cir. 2015) (unpublished); *see also Ketelboeter*, 550 F.3d at 625 ("if the treating physician's opinion is . . . internally inconsistent the ALJ may discount it"), it is difficult to say from only the opinion itself whether those apparent inconsistencies could have been explained if Dr. Ali had been contacted for further information.

More importantly, "[t]he 'treating physician rule' does not apply to RFC determinations by physicians; the extent of what a claimant can do despite her limitations is committed to the exclusive discretion of the ALJ." *Bates*, 736 F.3d at 1100 (citing 20 C.F.R. § 404.1545(a)(1) (defining RFC), and 20 C.F.R § 404.1527(d) (noting that the final responsibility for determining a claimant's RFC is reserved to

---

[17] For instance, Dr. Ali answered "yes" to the question whether Ritchie reasonably could be expected to have marked limitation in [her] ability to perform at a consistent pace without an unreasonable number and length of rest periods due to symptoms related to [her] conditions." But she answered no" to the question whether Ritchie reasonably could be expected to have "marked limitation in [her] ability to complete a normal workday and workweek without interruptions from symptoms related to [her] condition." She then answered that she did not know whether Ritchie could "reasonably be expected to have significant problems in sustaining any type of full time work activity on a full time 5-day per week basis." AR 263.

the Commissioner)). Thus, only statements within Dr. Ali's opinion "that do not state what [Ritchie] can or cannot do in a given day constitute" opinions of a treating physician "to which the ALJ must defer." *Id.* (citing 20 C.F.R. § 404.1527(a)(2) (defining medical opinions)). Dr. Ali's written report consists primarily of medical opinions regarding Ritchie's RFC, which are not entitled to controlling weight. Nevertheless, even as to Dr. Ali's opinions that fall in this category, "the ALJ must consider [them] and should recontact the doctor for clarification if necessary." *Barnett,* 381 F.3d at 669; *see also Smith*, 231 F.3d at 437 (criticizing the ALJ for discounting the functional limitations set forth by treating physician and stating that, if the ALJ was concerned that the medical evidence was insufficient to support those limitations, he should have ordered more recent medical records).

Neither the internal inconsistencies nor the lack of explanation for Dr. Ali's RFC determinations was discussed by the ALJ, and the reasons the ALJ did give for rejecting Dr. Ali's opinion either reveal faulty logic or are not properly explained with reference to other evidence in the record. "[A]n administrative agency's decision cannot be upheld when the reasoning process employed by the decision maker exhibits deep logical flaws, . . . even if those flaws might be dissipated by a fuller and more exact engagement with the facts." *Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004) (internal citations omitted). Because the reasons the ALJ *gave* for rejecting Dr. Ali's opinions are legally insufficient and not supported by

substantial evidence, the ALJ's decision must be reversed and the case remanded to conduct a further inquiry.

## B.     RITCHIE'S CREDIBILITY

Aside from Dr. Ali's opinion and Dr. Carlton's report, neither of which as discussed are particularly compelling evidence, the evidence in the record regarding Ritchie's alleged disability consisted of Ritchie's testimony. The ALJ discounted Ritchie's testimony for reasons Ritchie claims were not based on sufficient evidence. The Court agrees. For instance, the ALJ relied on evidence in the record showing that Ritchie jogged three times a week, four to five miles each time. Ritchie is not entitled to benefits pre-dating her August 2011 application date,[18] and the evidence of Ritchie's jogging was from 2009. While the ALJ was entitled to consider all of the evidence in the record, including evidence related to Ritchie's condition in 2009, *see Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 193 (1st Cir. 1987), the fact that Ritchie jogged in 2009 is at most only slightly impeaching of Ritchie's testimony concerning her functional limitations in 2011, when she applied for supplemental security benefits.[19]

---

[18] *See* SSR 83-20 (S.S.A. 1983) ("Under title XVI, there is no retroactivity of payment. Supplemental security income (SSI) payments are prorated for the first month for which eligibility is established after application and after a period of ineligibility.").

[19] It was impeaching because there is evidence in the record that Ritchie may have represented that she became disabled before 2009 when she was still jogging. *See* AR 168 (disability report generated by the Social Security Field Office where Ritchie was interviewed for her benefits application, which represents that the "claimant's alleged onset date" is "12/30/2007"). Assuming Ritchie did refer to this date as the date when she first became disabled, that is only *slightly* impeaching because she may not have understood the distinction between the date when she

The ALJ also erred in finding several points of potential inconsistencies in Ritchie's testimony without even asking Ritchie about them. *See Scrogham v. Colvin*, 765 F.3d 685, 699 (7th Cir. 2014) (cautioning ALJs to make inquiries of the claimant about any perceived inconsistencies in the record); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (finding that an ALJ must not draw any inferences about claimant's condition from his lack of medical care, "unless the ALJ has explored the claimant's explanations as to the lack of medical care"). For instance, the ALJ stated that Ritchie "stopped work because there was no more work available and not due to her medically determinable impairment." AR 26. Ritchie testified, however, that she closed her broker business at the end of 2007 because she became ill. AR 46. The ALJ apparently relied to the contrary on information contained in one of the forms Ritchie completed, in which Ritchie stated that the date she stopped working was "12/30/1994," and, on the next line, stated that the reason she stopped working was "no more work." AR 172. The lack of work thus appears to be in reference to an earlier period of employment shown on the same form to have been from 1979 to 1993, R. 173, which employment is unrelated to her relevant job history from the past fifteen years when she worked as a real estate

first experienced symptoms of her illness (2007 was when Ritchie was admitted to the hospital following the incident when she fainted at home) and the date when she met the definition of disabled under the rules and regulations of the Social Security Administration. *See Armstrong v. Comm'r*, 160 F.3d 587, 590 (9th Cir. 1998) (the onset date is determined by the date when the impairment became disabling and not just present). Also, even if she stopped working in 2007 because of her illness although she was not yet disabled, that does not mean that her illness did not get worse over the years and that she was not disabled as of her 2011 benefits application when it is undisputed that Ritchie's current activities do not include jogging.

agent. The ALJ also pointed out various notations in Ritchie's medical records saying that Ritchie denied suffering from dizziness, shortness of breath, or chest pains. But, as previously noted, a person can have good and bad days. *See, e.g., Bauer,* 532 F.3d at 609 (faulting ALJ for being overly influenced by "hopeful remarks" in the plaintiff's treatment notes, such as she is doing "fairly well" or her "reported level of function was . . . improved," because it suggests a lack of understanding that a chronic medical condition that is not necessarily disabling all of the time may still prevent a person from performing a full-time job having particular requirements). In addition, the medical records reflect out-of-court statements purportedly made by Ritchie, and the ALJ failed to give Ritchie an opportunity to explain by asking her at the hearing about the statements before accepting them as true and using them to impeach her testimony. *See Schickel*, 2015 WL 8481964, at *14 (holding that the ALJ's failure to ask the claimant about perceived inconsistencies "undermines his assessment").

Finally, the ALJ found Ritchie's testimony to be inconsistent with the testimony of her mother. But the minor differences in Ritchie's mother's testimony noted by the ALJ are a thin reed for the ALJ to rely on for his conclusion that Ritchie's testimony concerning her daily activities and functioning was not credible.[20] Moreover, even if the ALJ credited the level of functioning attributed to

---

[20] Ritchie's mother did not testify at the hearing but filed a Third Party Function Report concerning Ritchie's daily limitations dated May 17, 2011. AR 200. She described Ritchie's daily schedule as consisting of bible study two to three days a week, a daily 1.5-hour nap around noon, talks on the phone, food preparation for her and her son, and a ten minute walk. AR 201. She noted that Ritchie takes care

Ritchie by her mother, that still would not justify the ALJ's RFC finding of light work. As the Seventh Circuit has stated, the failure to recognize differences between activities in daily living, where a person has more flexibility in scheduling, can get help from other persons, and is not held to a minimum standard of performance, versus a full-time job, where the opposite is true, "is a recurrent, and deplorable feature of opinions by administrative law judges in social security disability cases." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *see also Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016) (the court "has repeatedly held improper" an ALJ's determination that a claimant's ability to care for herself and family members means she is not disabled); *Beardsley*, 758 F.3d at 838 (finding that claimant's limited ability to care for her mother "lend[s] no support to the conclusion that she would be able to spend six hours a day, every day, on her feet working"); *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (remanding where ALJ found claimant's spinal disc disease-related pain allegations not credible based on her ability to care for self and children). For similar reasons, the ALJ accorded too much weight to the fact that Ritchie testified she walks for ten minutes every other day. The ALJ commented that 4 to 6 blocks was an "impressive ability to walk." AR 26. But a 4 to 6 block walk every other day does not equate to a 6 to 8 hour work-day, nor does it account for Ritchie's need to which she testified to sleep

of her teenage son, and is able to do light household chores such as laundry and dishes. *Id.* She stated that Ritchie is able to grocery shop for about twenty to thirty minutes weekly. AR 203. She estimated that Ritchie could walk for up to 20-25 minutes and stand for 15-20 minutes before needing a break. AR 205. She also noted that Ritchie is now unable to partake in her previous exercise hobbies such as biking and running. AR 204.

intermittently throughout the day. *Cf. Carradine*, 360 F.3d at 756 ("activities such as walking in the mall and swimming are not necessarily transferable to the work setting . . . A patient may do these activities . . . for therapeutic reasons, but that does not mean she could concentrate on work . . . or could engage in similar activity for a longer period").

The illogical conclusions that the ALJ reached regarding Ritchie's daily activities are "especially relevant" here because the Seventh Circuit has specified that "no employer is likely to hire a person who must stop working and lie down two or three times a day for an hour at a time." *Roddy*, 705 F.3d at 639; *see also Allensworth*, 814 F.3d at 833 (a person "cannot hold a full-time job if he is unable to stay awake for long periods of time or falls asleep unexpectedly"). The ALJ gave only superficial treatment to the issues of Ritchie's fatigue, dizziness, headaches, nausea, and need to nap intermittently throughout the day, noting that Ritchie's testimony concerning her physical limitations from these symptoms was not credible because the record showed she still drove a car, cooked meals regularly, has maintained her weight, and has not required hospitalization or emergency room treatment in either 2011 or 2012. AR 26-27. In addition, the ALJ found Ritchie's testimony concerning fatigue and need to sleep not credible *only* in light of the testimony of her mother, which the ALJ said "indicate[d] a person who is up and about more than the testimony suggests." AR 27. In what way Ritchie's mother's testimony indicated a person who was capable of work in the light category the ALJ did not explain. "Although the ALJ need not discuss every piece of evidence in the

record, he must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *see, e.g., Cuevas v. Barnhart*, 2004 WL 1588277, at *15 (N.D. Ill. July 14, 2004) ("To the extent she chose not to address the issues of pain and naps because she found Mr. Cuevas' testimony on these issues to be incredible, the ALJ was required to explain her reasoning."). The ALJ failed to adequately address Ritchie's testimony concerning her specific symptoms, especially her fatigue, and failed to adequately explain his reasoning behind his conclusion that Ritchie could maintain a full time job despite her symptoms. *See Allensworth*, 814 F.3d at 835 (finding that, given the claimant's testimony, there was a "gaping hole in the record" regarding evidence that plaintiff could "lift or carry weight, stand or sit for six hours in an 8–hour workday, or maintain sufficient concentration to be able to perform simple, repetitive tasks," without which the claimant "is disabled from gainful employment").

## C.    OTHER ISSUES

The Court will briefly address two other issues raised by Ritchie for reversal of the ALJ's decision.

### 1.    ONSET DATE

Ritchie argues that the ALJ erred when he did not consider adjusting the onset date of her disability to September 29, 2011 (after her March 2011 benefits application date), because her blood pressure readings "began to careen between

hypotension and hypertension" then. R. 24 at 9. The Social Security Administration

defines the onset date of disability as

> "the first day an individual is disabled as defined in the
> Act and the regulations. Factors relevant to the
> determination of disability onset include the individual's
> allegation, the work history, and the medical evidence.
> These factors are often evaluated together to arrive at the
> onset date. However, the individual's allegation or the
> date of work stoppage is significant in determining onset
> only if it is consistent with the severity of the condition(s)
> shown by the medical evidence.

SSR 83-20 (S.S.A. 1983).

The ALJ did not make any finding as to the onset date of Ritchie's disability,

and, as the Commissioner points out, his failure to do so was not error. *See* R. 29 at

10-11 (citing *Sheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004) ("The ALJ did not

find that [plaintiff] was disabled, and therefore, there was no need to find an onset

date."); *Eichstadt v. Astrue*, 534 F.3d 664, 667 (7th Cir. 2008) ("With no finding of

disability, there was no need to determine an onset date.")). What Ritchie really is

arguing is that the Commissioner ignored the evidence from September 2011, and,

had he not done so, he may have found her disabled at least as of this date if not

earlier. The problem with this argument is that, as the Commissioner points out,

the post-application evidence cited by Ritchie shows that her blood pressure

readings were all "in the normal range per the definition [claimant] offered." R. 29

at 9. Therefore, the September 2011 evidence that Ritchie believes the ALJ ignored

would not have affected the ALJ's disability determination.

Nevertheless, Ritchie is correct that the ALJ has a duty to determine an onset date if he were to find that Ritchie was disabled but the disability did not arise until after the date of Ritchie's application. *See* SSR 83-20 (S.S.A. 1983) ("the only instances when the specific date of onset must be separately determined for a title XVI case is when the onset is subsequent to the date of filing or when it is necessary to determine whether the duration requirement is met"). Because the Court finds in another part of this opinion that a remand is appropriate for a different reason, Ritchie will have an opportunity if she wants to supplement the record with additional information concerning her blood pressure readings, and can present her argument regarding a later onset date for her disability in the first instance to the ALJ.

## 2.    EVIDENCE OF PSYCHOLOGICAL DISABILITY

Ritchie also complains that the ALJ failed to fully develop the record related to a potential psychological disability. "'While it is true that the ALJ has a duty to make a complete record, this requirement can reasonably require only so much.'" *Latkowski v. Barnhart*, 93 Fed. App'x 963, 972 (7th Cir. 2004) (unpublished) (quoting *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004)). "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant remand." *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994). Ritchie has not sufficiently "set forth specific, relevant facts—such as medical evidence—that the ALJ did not consider" on this point. *Nelms v. Astrue,* 553 F.3d 1093, 1098 (7th Cir. 2009). However, on remand, Ritchie may submit additional

evidence on her psychological condition if she wishes to have it considered by the ALJ.

**D.    DISPOSITION**

The reasons the ALJ gave for rejecting the opinions of Ritchie's treating physician are inadequate to "build an accurate and logical bridge between the evidence and the result." *Beardsley*, 758 F.3d at 837. Moreover, this error was compounded by the ALJ's reliance on Dr. Carlton and adversely affected the ALJ's assessment of Ritchie's credibility. Because the ALJ's decision, in its present form, falls below the mark, the Court lacks a sufficient basis to sustain the ALJ's ruling of no disability. Without suggesting that the ALJ's finding of no disability was incorrect, the case must be remanded for further proceedings.

On remand, the Commissioner should conduct a reevaluation of Ritchie's complaints with due regard for the full range of medical evidence. While the Commissioner need not seek additional evidence if the evidence is consistent and sufficient on which to base a decision, *see* 20 C.F.R. § 404.1527(c)(3), 20 C.F.R. § 404.1527(c)(1); *Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir. 1994), the Court does not believe the current record satisfies that standard. Therefore, on remand, the ALJ should seek further input from medical experts, including Ritchie's treating physician, regarding Ritchie's physical impairments and their effects on Ritchie's RFC. The ALJ should then reassess Ritchie's credibility, should seek further clarification from Ritchie on evidence in the record the ALJ believes conflicts with

her testimony, and should fully explain the basis for the Commission's decision in accordance with the applicable rules and regulations.

## CONCLUSION

For the foregoing reasons, Ritchie's motion for summary judgment, R. 24, is granted, the Commissioner's motion for summary judgment, R. 29, is denied, and the case is remanded for further proceedings consistent with this decision.

ENTERED:

_____ Thomas M Durkin
Honorable Thomas M. Durkin
United States District Judge

Dated: December 16, 2016